**Juan C. Chavez**, OSB #136428
**Franz Bruggemeier**, OSB #163533
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
Telephone: 503-944-2270
Facsimile: 971-275-1839

       Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
## PORTLAND DIVISION

| | |
|---|---|
| RACHEL CAMERON, | Case No. |
| Plaintiff, | |
| v. | COMPLAINT |
| CITY OF PORTLAND, JOHN DOES 1-12, | Civil Rights Action (42 U.S.C. § 1983); and Battery (State Tort), Assault (State Tort), and Negligence (State Tort) |
| Defendants. | |
| | JURY TRIAL DEMANDED |

Plaintiff RACHEL CAMERON, by and through her attorneys, does hereby state and allege:

### PRELIMINARY STATEMENT

This is a civil rights action brought pursuant to 42 U.S.C. § 1983. In 2020, Plaintiff

Rachel Cameron (pronouns: she/her) and tens of thousands of her fellow community members,

and millions of other people around the world, took to the streets to protest white supremacy and

police violence in the United States generally and in Portland specifically. Defendant City of

Portland ("City"), by and through its agents, Portland Police Bureau ("PPB"), including John

Does 1-3, responded to the protests with widespread unlawful violence against demonstrators. Plaintiff Cameron is suing the Defendant City of Portland and John Does 1-3 because on July 18, 2020, while near the Portland Police Association (hereinafter, "PPA") building, the members of the City's police bureau used unlawful and intentionally brutal force to disperse protesters from the area, including Cameron. Like many Portlanders of conscience, Cameron had taken to the streets in protest of the police abuses that had been witnessed here in Portland and across the county. The PPA building, home to the Portland Police Bureau's ("PPB") rank and file bargaining unit, a group with a notoriously hostile view of police accountability, had become a locus of political speech and assembly. As she was attempting to leave the protest, Plaintiff was injured when PPB officers John Doe 3 shoved Plaintiff and John Does 1-2 shoved her to the ground, causing her to hit her head and tailbone on the ground, and causing injury to her neck. Plaintiff felt the lasting effects of her injuries for weeks and had to close her business for over three weeks because of her injuries. The attack on Plaintiff is in keeping a pattern and practice of the City of Portland and Defendants John Does 1-12 of unlawfully using force to punish people who demonstrate and express sentiments in support of police accountability or against white supremacy.

By reason of Defendants' actions, Plaintiff was deprived of her constitutional rights and physically injured. Plaintiff seeks an award of compensatory and punitive damages and attorneys' fees.

## JURISDICTION

1.      This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3-4). This case is brought pursuant to 42 U.S.C. § 1983 and § 1988 for violations of the First, Fourth and Fourteenth Amendments to the Constitution of the United States.

2.      This court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 to hear and

determine Plaintiff's state law claims because those claims are related to Plaintiff's federal law

claims and arise out of a common nucleus of facts. Plaintiff's state law claims are related to their

federal law claims such that those claims form part of the same case or controversy under Article

III of the United States Constitution. Jurisdiction is also conferred under 28 U.S.C. § 1343.

## VENUE

3.      Venue is proper within the District of Oregon because a substantial part of the events

giving rise to this claim occurred in this judicial district, and all parties reside in this judicial

district. 28 U.S.C. § 1391(b). The acts and practices alleged herein occurred in Portland,

Multnomah County, Oregon.

## PARTIES

4.      Rachel Cameron, Plaintiff, at the time of filing and all material times, was a resident of

the State of Oregon and Multnomah County.

5.      Defendant City of Portland (hereinafter, "City") is a political subdivision of the State of

Oregon with the capacity to sue and be sued. The City runs the Portland Police Bureau

(hereinafter, "PPB"). On information and belief, each and every decision to unlawfully use force

against Plaintiff was made and/or ratified by a sufficiently high level as to be policy decision of

the City. On information and belief, the PPB members who used force against Plaintiff were

acting pursuant to the practice or policy of the City.

6.      Plaintiff does not know the name of Defendant John Does 1-2, and thus sues them under

a fictitious name. John Does 1-2 are law enforcement officers who, under color of law, shoved

Plaintiff, injuring her, John Does 1-2 are sued in their individual capacity. Plaintiff intends to

amend to name the individual defendants as parties to this lawsuit once their true names and

identities have been discovered.

7.      Plaintiff does not know the name of Defendant John Doe 3, and thus sues them under a fictitious name. John Doe 3 is a law enforcement officer who, under color of law, shoved Plaintiff. They are sued in their individual capacity. Plaintiff intends to amend to name the individual defendants as parties to this lawsuit once their true names and identities have been discovered.

8.      Plaintiff does not know the names of Defendants John Does 3-12, and thus sues them under fictitious names. John Does 3-12 are any City employees who exercised command responsibility over, conspired with, aided and abetted subordinates, and/or directly or indirectly participated in the deprivation of Plaintiff's civil rights as hereinafter alleged, or furthered the pattern and practice of unconstitutional conduct hereinafter alleged. They are sued in their individual capacities.

## FACTUAL ALLEGATIONS

### I.      Introduction: Black Lives Matter.

9.      The disproportionate and excessive use of force against Black people by police officers in the United States is a well-documented, systemic problem. It exists in every police department in this country, including the PPB.

10.     For many years, advocates and activists have attempted, largely unsuccessfully, to get the City to address and reduce the Portland Police Bureau's disproportionate use of force, stops, searches, seizures, and arrests of Black people, Indigenous people, and people of color. Efforts to address the Portland Police Bureau's racial profiling dates back to the 1990s.[1] And yet, despite

---

[1] https://www.portlandoregon.gov/police/article/32381

all the recommendations, implemented or more often, not, PPB continues to engage in disproportionate targeting of Black people in stops, searches, seizures, and uses of force.

11.     On May 25, 2020, in Minneapolis, Minnesota, a Black man named George Floyd was murdered on video by Officer Derek Chauvin of the Minneapolis Police Department while three of his fellow officers watched and did nothing to intervene. Officer Chauvin knelt on Mr. Floyd's neck while Mr. Floyd pleaded for his life, repeatedly telling Chauvin that he could not breathe. A bystander video of the murder quickly went viral, sparking outrage throughout the country.

12.     For many Americans, and particularly Black Americans, the murder of George Floyd, in broad daylight while being openly filmed by a witness, was the proverbial straw that broke the camel's back. Fed up with the empty platitudes and the endless yet ineffective "reforms" by their political and law enforcement leaders, millions of Americans took to the streets in protest, demanding an end to police violence and white supremacy, and refusing to leave those streets unless and until meaningful change is made.

13.     Protests against police violence have been met with police violence in nearly every city around the country. Videos shared in the press and on social media show the police in this country out of control: attacking journalists, attacking bystanders, threatening children, assaulting people for insulting them, engaging in drive-by attacks with "less lethal" weapons, planting weapons in the hands of people arrested, pulling off demonstrators' CDC-recommended facemasks and pepper-spraying them, kettling whole groups of protesters only to launch tear gas at them, driving their cars directly through crowds of people, using military helicopters in efforts to terrify civilians, discussing plans to shoot protesters, and above all, using massive amounts of tear gas and impact weapons in a systemic effort to stop people from protesting police violence.

This violent police response only strengthened the resolve of protesters for the need to continue protesting against police violence.

14.     Beginning on May 29, 2020, Portlanders began a months-long succession of demonstrations in the streets demanding justice for George Floyd and demanding an end to police violence. The PPB, like police departments throughout the country, have met these demands with extreme, unreasonable, and unlawful force against protesters, and that extreme and unlawful force has been condoned and ratified by the City, allowing those unlawful practices by PPB members to continue.

15.     On June 23, 2021, Mayor Ted Wheeler, who in addition to being the chief executive for the City of Portland is also the PPB's commissioner-in-charge, articulated this policy succinctly as wanting protesters to "hurt."[2]

### II. PPB's Pattern and Practice of Targeting Police Accountability Protesters

16.     On several occasions since 2017, demonstrations in support of police and against the Black Lives Matter movement have occurred in Portland. During these demonstrations, Defendants did not use tear gas, impact munitions, nor any force against these protestors. Instead, PPB provided escorts to maintain the safety and security of these protestors, an accommodation not afforded to those protesting police violence. For example, on August 17, 2019, a group of approximately 500 pro-fascist, pro-police, anti-Black activists from across the country held an unpermitted rally in Tom McCall Waterfront Park in downtown Portland. The stated aim of the rally organizers was to waste city funds and resources. PPB made extensive accommodations for the rally, including closing the Hawthorne Bridge to traffic, erecting

---

[2] Aaron Mesh, *Portland Mayor Wants Reed College to Expel Student If He's Convicted of Smashing Downtown Windows*, Willamette Week (April 23, 2021), https://www.wweek.com/news/city/2021/04/23/portland-mayor-wants-reed-college-to-expel-student-if-hes-convicted-of-smashing-downtown-windows/

concrete barriers around the site of the rally, and placing a heavily armed police presence between the fascist rally and counter protesters. After the far-right rally in Tom McCall Waterfront Park, PPB opened the Hawthorne Bridge for the exclusive use of the fascist rally. PPB declared a civil disturbance after the far-right rally dispersed, ultimately arresting 13 counter protesters. The organizers of the fascist event announced they would return to Portland each month to continue to waste city resources.

17.     Likewise, on August 22, 2020, many anti-Black Lives Matter protestors descended on Portland, armed with paintball guns, metal rods, aluminum bats, fireworks, pepper-spray, rifles and handguns in an attempt to intimidate and rally against Black Lives Matter protestors. Defendants did not intervene or arrest these pro-police demonstrators for posing threats to Portland community members.

18.     Similarly, on September 26, 2020, a group of approximately 200 pro-fascist, pro-police, anti-Black activists descended on Delta Park for a rally for the express purpose of provoking a violent confrontation with anti-fascist activists. They open-carried firearms within the park, in violation of city code, set up armed check points to control access to the park, and forcibly removed people they decided were not there to support their fascist cause. At least one individual was jumped and given a concussion by the violent mob. At one point, a vehicle arrived and delivered dozens of homemade shields. Despite the presence of dozens of police officers, including PPB "liaison officers" on foot in the park, defendants did not intervene in any way with this criminal activity. On the same day, at the same time, anti-fascist organizers held a rally three miles away in Peninsula Park. That rally was specifically designed to avoid violent confrontations with the fascist rally. No march was planned. Nevertheless, there was a heavy

police presence from PPB, and PPB seized homemade shields from participants and arrested individual participants.

### III. PPB's Pattern and Practice of Illegal Use of Force at Protests

19.    PPB has a policy or practice of using force without individualized justification to disperse protestors. From May 30, 2020, and onwards, PPB regularly used force consistent with this policy and practice against people like Plaintiff, *i.e.*, without sufficient, lawful, individualized justification to use force. This policy and practice existed to punish people like Plaintiff who wanted to call attention to PPB's rampant lawlessness and violence against the public.

20.    Former PPB Chief Jamie Resch stated in a news conference on June 3, 2020, that the decision to use tear gas, other riot control, and "less lethal" weapons against a crowd of protesters the evening prior was made by incident commanders, such as John Does 4-12, at the scene.

21.    PPB has failed to accurately document or evaluate its officers' use of force against protesters. PPB, including John Does 1-12, has demonstrated that it does not take criticisms of its use of force seriously, and it is unwilling or unable to honestly assess, much less ameliorate, its pattern and practice of unconstitutional use of force against protesters without outside orders or supervision.

22.    In an evaluation of PPB's after-action reports (AARs) and other Bureau documentation reviewing and assessing its response to protests between May 29 to November 15, 2020, the attorneys in the U.S. Department of Justice Civil Rights Division ("USDOJ") stated that "PPB's self-assessment insufficiently analyzes its management of force, its members' justifications for force, and the organization's plan to enforce compliance with policy and training. Instead, PPB

focuses primarily on external factors beyond its control while over-relying on training and software to address the few faults it is willing to own."

23.    PPB broadly portrays all force as justified and evaluated itself as doing an *excellent* job handling the nightly protest.

24.    PPB has a pattern of misusing the phrase "active aggression" and "active resistance" to justify force against individuals who engaged in passive resistance or merely failed to disperse.

25.    PPB did not assess whether officers violated PPB policies related to using force, reporting force, and reviewing force reports. In its evaluation of use of force at protests, PPB supervisors focus on the articulation of members' justifications for using force, rather than whether a particular use of force was justified.

26.    PPB has failed to issue use of force warnings to individuals, like Plaintiff, or confirm that subjects heard use of force warnings, before using force on protesters.

27.    The PPB supervisors assigned to complete AARs had little to no crowd management training.

28.    PPB has failed to hold officers, supervisors, and executives accountable for using or approving force without sufficiently articulating a permissible justification.

29.    PPB scheduled a Rapid Response Team (RRT) training for April, 2021, and only created lesson plans for parts of the training after DOJ requested copies. PPB ended up cancelling this training because the materials and outlines were insufficient to meet the DOJ's required standards.

30.    PPB treated the failure to disperse as sufficient justification, in and of itself, to use force against protesters. PPB did not engage in individualized assessments of the reasonableness of a particular use of force against a particular person, as required by their PPB Directive 1010.

Instead, the officers on the ground and their supervising officers believed that a mere failure to disperse, which is only passive resistance, was sufficient to justify the use of indiscriminate force. This unconstitutional policy has been justified, in part, by some PPB members pointing to a different directive, PPB Directive 635.10, and ignoring that that directive clearly and explicitly incorporates the Constitutional force standard and Directive 1010.

31.    As USDOJ noted in their June 30, 2022, compliance report, "In force reviews covered by these investigations, PPB officers and executives repeatedly noted that PPB's Rapid Response Team (RRT) members were trained that they need not follow Directive 1010.00, *because they were authorized to use greater force under Directive 635.10*."[3] (Emphasis added.) Later in their report, USDOJ continues: "PPB has repeatedly asserted that RRT training instructed members that they could use force based on PPB's Directive 635.10, without following the requirements of Directive 1010.00."[4]

32.    Ultimately, over two years after the death of George Floyd, Defendant has failed to acknowledge the importance of PPB members complying with constitutional standards, adhering to approved policies, and enforcing policy violations. That includes the use of force of pushing and shoving protesters, like Plaintiff.

### IV. Court Orders and Contempt

33.    As a result of PPB's lawless uses of force against protesters, Federal and State Courts in Oregon have used their remedial powers to restrain PPB's excesses.

34.    The case *Don't Shoot Portland, et al v. City of Portland*, Or. Dist. Case No. 3:20-cv-00917-HZ, was filed on June 6, 2020 directly in response to the opening days of mass police violence in the wake of George Floyd's murder. The Plaintiffs sought and received an injunction

---

[3] *United States v. City of Portland*, USDC of Or. Case No. 3:12-cv-02265-SI (2012), Dkt. 292-1, p. 4.
[4] *Id.* at p. 25.

placing limits on police use of force at protests shortly after filing their case. The Court later found that PPB's conduct on June 30, 2020, violated the Court's order—specifically owing to the use of impact munitions shot at protesters who were not actively aggressive.

35.     Through the *Don't Shoot* litigation, the public learned that PPB had trained their riot police with incorrect use of force standards, such as with citations to opinion overruled in *Headwaters Forest Def. v. County of Humboldt*, 276 F.3d 1125, 1130 (9th Cir. 2002) and with incorrect descriptions of protesters walking slowly as "actively aggressive." One training concluded with a slide, shown below, that caricatured police accountability protesters and advocated for violence against them.



36.     The case *Index Newspapers LLC, et al v. US Marshals Serv., US DHS, and City of Portland*, Or. Dist. Court Case 3:20-cv-01035-SI was filed on June 28, 2020. The Plaintiffs were non-protesters who were passively observing protests—members of the media, legal observers—who were nonetheless targeted for injury and/or dispersal by PPB. The Court enjoined PPB from this practice.

37.     The case *ACLU & Protestor #1 v. City of Portland*, Mult. Co. Cir. Case No. 20CV27116

was filed in July 2020 after it became apparent PPB had been violating ORS 181A.250. That

Oregon law prevents law enforcement from surveilling people because of their political

activities. The State court enjoined PPB from this practice in September 2020.

38.     As partly discussed above, the United States Department of Justice has maintained a

quasi-consent decree against the Portland Police Bureau because of its pattern and practice of

using excessive force against people with mental illness. *United States v. City of Portland*, Or.

Dist. Case No. 3:12-cv-02265-SI. As part of its obligations under the settlement agreement the

City had entered into with the USDOJ, PPB had to maintain records regarding its use of force

and comply with the U.S. Constitution. The USDOJ found PPB in violation with the settlement

agreement owing to its actions in 2020 and has sought remedial sanctions against the City of

Portland.

39.     As described in the preceding paragraphs, numerous courts have found that PPB has

violated the law on multiple occasions—acutely so in the summer of 2020, when they injured

Plaintiff.

### VI. July 18, 2020

40.     In the evening of July 18, 2020, Plaintiff attended a protest near the PPA building. She

heard the crowd from the bicycle shop that she owned and operated, and she went to join the

crowd in support of Black lives and against police violence.

41.     Plaintiff was standing peacefully among the crowd when she heard PPB declare that the

assembly was a riot, give an order to leave the area, and begin to shoot teargas into the crowd.

During the protest and at all times that night, Plaintiff had done nothing to engage in any

property destruction, violence against a person, or anything other than peacefully protesting.

42.     Plaintiff heard the direction to leave the area from the loudspeaker, and she immediately attempted to leave the area. Her place of business was only a block or two to the West on Lombard, and the line of PPB officers was not directly in front of her on the sidewalk, so she believed she could get back to her business and pick up her belongings to go home by going West.

43.     As she was alone and away from the crowd and walking West to leave the area, Defendants John Does 1-3 broke from the main police line and approached Plaintiff quickly. They said something to her only as they reached her, telling Plaintiff to go East at the same time that one of the Defendants, John Does 1-3, shoved Plaintiff. She stumbled back from the shove, telling them that she was going home to the West. One Defendant told Plaintiff that she would have to go around the block, and before she could respond or do anything else, Defendants John Does 1 and 2 shoved Plaintiff to the ground.

44.     Their shove knocked Plaintiff to the ground backwards, causing her to hit the back of her head on the ground, and it immediately begin bleeding, see photo below. The shove caused her



to also hit her tailbone on the ground and caused her neck pain that lasted weeks.

45.     Defendant John Doe 1 stood over her as she first attempted to stand up and while she touched the back of her head and saw that it was bleeding. He told her again to go East and Defendants Does 1-3 left Plaintiff behind them as they moved East. They did not attempt to arrest Plaintiff or detain her other than knocking her to the ground.

46.     Plaintiff then went East and found a protest medic who attended to her bloody head wound.

47.     Due to the pain in her neck and head, Plaintiff was forced to close her business from July 19 until August 3. Plaintiff went to the doctor on July 23, after her head and neck were still causing her a great amount of pain. She also sought back and neck treatment and physical therapy. She was in pain for weeks and had to close her business for weeks, causing her to lose income, because of the pain and other symptoms of being knocked down and hitting her head. Plaintiff attempted to reopen her business on August 3 but working caused her so much pain that she had to close her business again from August 4 until August 12. Even months later, Plaintiff suffered from concussion symptoms such as foggy headedness and her business continued to suffer, which also caused her to lose income. The attack on her from Defendants Does 1 and 2 also caused her emotional and psychological fear and harm.

### Claim 1: Fourth Amendment – Unlawful Seizure – Individual Liability
### (42 U.S.C. § 1983)

48.     Plaintiff incorporates the preceding paragraphs as if restated here.

49.     It is clearly established law that an officer may not use force that, in light of the circumstances and as perceivable by a reasonable, objective officer, is excessive and unnecessary.

50.     In taking the actions described above, by shoving Plaintiff twice and the second time knocking her to the ground, causing her lasting and serious injuries, Defendants Does 1-3 intentionally violated Plaintiff's right to be free from unlawful seizures guaranteed by the Fourth Amendment to the United States Constitution.

51.     Defendants Does 1-3 violated rights held by Plaintiff which were clearly established, and no reasonable official similarly situated to those Defendants could have believed that their conduct was lawful or within the bounds of reasonable discretion. Defendants Does 1-3 therefore do not have qualified or statutory immunity from suit or liability.

52.     The actions of Defendants Does 1-3, as described in this complaint, were malicious, deliberate, intentional, and embarked upon with the knowledge of, or in conscious disregard of,

53.      the harm that would be inflicted upon Plaintiff. As a result of said intentional conduct, Plaintiff is entitled to punitive damages against Defendants Does 1-3, in their individual capacity, in an amount sufficient to punish them and to deter others from like conduct.

54.     Defendants Does 4-12 participated in Plaintiff's injury by directly participating in Plaintiff's harm, in failing to train, supervise, and discipline John Does 1-3, and/or by directing Does 1-3 to attack Plaintiff. Their direct participation in the injury caused Plaintiff's rights to be injured.

55.     The unreasonable seizure of Plaintiff was the direct and proximate cause of bodily injury, pain, lost income, loss of liberty, mental and emotional suffering, worry, fear, and anguish. Plaintiff is entitled to all of her damages in an amount to be ascertained according to proof at trial.

///

///

## Claim 2: Fourth Amendment – Unlawful Pattern and Practice – Municipal Liability
## (42 U.S.C. § 1983)

56.     Plaintiff incorporates the preceding paragraphs as if restated here.

57.     As described in Claim 1, Defendant Does 1-12violated Plaintiff constitutional right to be free from unlawful seizures.

58.     The conduct of Defendant Does 1-12is illustrative of a pattern and practice of PPB officers violating the Fourth Amendment rights individuals at protest demonstrations countering white supremacist groups and/or police misconduct.

59.     Defendant City of Portland does not have adequate supervisory review of incidents where officers use force that would correct patterns of unlawful actions by PPB officers in a timely or effective fashion, and rarely categorizes such unlawful seizures as out of policy even when the force is clearly excessive or when the arrest was without sufficient legal justification. Defendant John Does 1-3 received inadequate training, supervision, and/or discipline for violating the U.S. Constitution. Defendant City of Portland has effectively condoned this practice by repeatedly failing to correct constitutional violations by officers throughout the PPB.

60.     Defendants City of Portland and Does 4-12failed to train and discipline its officers, including Defendant Does 1-3, to follow the protections against these types of police and government repression and retaliation that have been recognized under the U.S. Constitution, as described above. As a result, Defendant Does 1-3 engaged in unconstitutional conduct that resulted in harm to Plaintiff.

61.     The unreasonable seizure of Plaintiff was the direct and proximate cause of bodily injury, pain, lost income, loss of liberty, mental and emotional suffering, worry, fear, and anguish. Plaintiff is entitled to all of her damages in an amount to be ascertained according to proof at trial.

**Claim 3: First Amendment — Unlawful Retaliation Against Speech — Individual Liability
(42 U.S.C. § 1983)**

62.     Plaintiff incorporates the preceding paragraphs as if restated here.

63.     As described above, Defendants targeted Plaintiff for injury not because they had

probable cause or other lawful justification to use force, but because they took offense to

Plaintiff's speech activity.

64.     The First Amendment protects persons from unlawful curtailment of expressive conduct,

assembly, and associations with one another.

65.     Defendant John Does 1-12's retaliatory motive was the but-for cause of Plaintiff's

injuries. By having attacked and injuring Plaintiff, Defendants chilled Plaintiff's political speech,

violating her First Amendment rights.

66.     The retaliation against Plaintiff was the direct and proximate cause of bodily injury, pain,

lost income, loss of liberty, mental and emotional suffering, worry, fear, and anguish. Plaintiff is

entitled to all of her damages in an amount to be ascertained according to proof at trial.


**Claim 4: First Amendment – Unlawful Pattern and Practice – Municipal Liability
(42 U.S.C. § 1983)**

67.     Plaintiff incorporates the preceding paragraphs as if restated here.

68.     As explained in Claim 3, Defendants John Does 1-12 violated Plaintiff's constitutional

speech rights.

69.     Defendants Does 1-12's conduct, and the conduct alleged in the preceding paragraphs, is

illustrative of a pattern and practice of PPB officers violating the First Amendment rights of

individuals at protest demonstrations against police misconduct. Defendant City of Portland has

a custom and practice of using militarized force against police reform, left-wing, or antifascist

protestors. Defendants' past Fourth and First Amendment violations were intended to punish a group of protestors *en masse* for their political speech. Defendant City of Portland does not use such tactics against right-wing protestors or fascist protestors, such as the Proud Boys or Patriot Prayer, despite their violent acts, disobedience of officers' orders, and clear intent to terrorize the community of Portlanders.

70.    The retaliation against Plaintiff was the direct and proximate cause of bodily injury, pain, lost income, loss of liberty, mental and emotional suffering, worry, fear, and anguish. Plaintiff is entitled to all of her damages in an amount to be ascertained according to proof at trial.

### Claim 5: Battery
### (State Tort)

71.    Plaintiff incorporates the preceding paragraphs as if restated here.

72.    Pursuant to a statutory tolling law passed by the Oregon legislature during the pandemic, Plaintiff submitted a timely tort claim notice against the City on March 31, 2022.

73.    As described above, agents of the Defendant City of Portland did unlawfully intend to come into physical contact with Plaintiff and did come into contact with Plaintiff. Defendant City's unlawful and intentional contact with Plaintiff was offensive.

74.    The battery against Plaintiff was the direct and proximate cause of bodily injury, pain, lost income, loss of liberty, mental and emotional suffering, worry, fear, and anguish. Plaintiff is entitled to all of her damages in an amount to be ascertained according to proof at trial.

### Claim 6: Assault
### (State Tort)

75.    Plaintiff incorporates the preceding paragraphs as if restated here.

76.     In taking the actions described above, agents of the Defendant City of Portland acted intentionally in placing in apprehension of imminent harmful or offensive contact when PPB members shoved Plaintiff to the ground. Plaintiff reasonably believed that further harmful and offensive conduct would occur when one of the officers stood over her while she lay bleeding on the ground after being shoved down.

77.     Such actions of agents of the Defendant City of Portland were unreasonable and excessive under the circumstances and were not otherwise privileged or justified under ORS 161.205 *et seq*.

78.     In performing the above-described acts, agents of the Defendant City of Portland directly and proximately caused Plaintiff to suffer non-economic damages.


**Claim 7: Negligence**
**(State Tort)**

79.     Plaintiff incorporates the preceding paragraphs as if restated here.

80.     The above-described actions of agents of the Defendant City of Portland created a duty of care to Plaintiff. The above-described actions of the Defendant breached that duty of care. Defendant's above-described individual or cumulative acts were unreasonable and excessively dangerous in light of the risk to Plaintiff and in light of the purported purposes of the acts.

81.     In addition to the common law articulation above, ORS 163.175 sets a standard of care that Defendant City's agents breached. Their actions are negligent *per se* as both statutes were violated.

82.     Additionally, agents of the Defendant City of Portland were engaging in an abnormally dangerous activity by shoving a nonthreatening person attempting to walk home. This gives rise to strict liability.

83.     In performing the above-described individual and cumulative acts, agents of the Defendant City of Portland directly and proximately caused Plaintiff physical and/or mental harm while infringing on Plaintiff's rights to be free from unlawful violence.

84.     Plaintiff's physical and mental harms and injuries were within the general type of potential incidents and injuries that made Defendant's conduct negligent. That is, the acts of agents of the Defendant City of Portland in using indiscriminate force, violence, chemical weapons that easily spread, and collective punishment, as described above, against lawful protestors and/or persons engaged in passive resistance created a foreseeable and unreasonable risk of harm of physical and mental harm that reasonably would likely result in infringements of Plaintiff's rights to be free from unlawful violence.

85.     Agents of the Defendant City of Portland are vicariously and directly liable to Plaintiff for the conduct of the Defendant's law enforcement agents alleged herein.

86.     In performing the above-described acts, Defendant John Does 1-3 directly and proximately caused Plaintiff to suffer physical and mental harms and non-economic damages.

87.     Agents of the Defendant City of Portland are vicariously liable to Plaintiff for the above-described conduct, which took place within the time and place of the Defendant's agents and were in part motivated by the Defendant's agents' motivation to serve and in furtherance of law enforcement purposes the Defendant's agents were hired to perform.

///

///

**REASONABLE ATTORNEY'S FEES AND COSTS**

88.    42 U.S.C. § 1988(b) allows "the prevailing party… a reasonable attorney's fee as part of the costs…" in an action brought under 42 U.S.C. § 1983.

89.    Plaintiff requests that the Court grant a reasonable attorney's fee in this action.

**CONCLUSION**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

A.    For economic and non-economic damages in an amount to be determined at trial;

B.    For reasonable attorneys' fees and costs pursuant to 42 U.S.C. §§ 1988; and

C.    Such other relief as the court deems just and proper.

DATED: July 18, 2022

*/s/ Juan C. Chavez*
Juan C. Chavez, OSB #136428
PO Box 5248
Portland, OR 97208

*ATTORNEY TO BE NOTICED*

*/s/ Franz Bruggemeier*
Franz Bruggemeier, OSB #163533
PO Box 5248
Portland, OR 97208

*ATTORNEY TO BE NOTICED*